IRVINE   v.   STATE.

*(Nashville.   March  14,  1900.)*

1. EVIDENCE.   *Res gestœ.*

Declarations are admissible as part of the *res gestœ* for what they are worth, which are made by defendant, three miles distant from the place of killing, when in the act of starting, armed, in search or pursuit of the party killed, to the effect that he intended merely to chastise said party with his fists for insulting his mother, and not to shoot him except in self-defense. (*Post, pp. 136–140.*)

Case cited and approved: Sawyers *v.* State, 15 Lea, 694.

2. SAME.   *Erroneous exclusion of, not reversible error, when.*

Erroneous exclusion of testimony is not reversible error if the fact that it tends to prove is otherwise satisfactorily proved in the case.   (*Post, pp. 140, 141.*)

3. SAME.   *Exclusion of erroneously admitted, cures error.*

The exclusion of evidence which has been erroneously admitted, cures the error.   (*Post, pp. 141. 142.*)

4. JURY.   *Misconduct.*

Although it is reprehensible conduct on the part of a juror to state or intimate to his fellow-jurors that he possesses knowledge of facts, if he were permitted to relate them, that would turn their sympathies against the defendant, it is not sufficient cause for reversal, when the juror made no statement of fact, and it does not appear that any juror was affected by what he said in their presence.   (*Post. pp. 142–144.*)

Case cited: Harvey *v.* Jones, 3 Hum., 159.

5. CRIMINAL LAW.   *Criminal responsibility of conspirators.*

Where two brothers arm themselves for a joint enterprise, to wit, to chastise a party who had insulted their mother—one to inflict the chastisement while the other stands guard—neither .intending to kill, except it became necessary in order to save

Irvine *v.* State.

their own lives, and, in the prosecution of their design. one of the brothers shoots and kills the assailed party, both brothers are equally guilty, even if the other did not participate in the shooting, and was himself shot and, at the time, disabled. (*Post, pp. 145–147.*)

6. SAME. *Same.*

All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things. a crime not specifically designed, but incidental to that which was the object of the confederacy. are responsible for such incidental crime. (*Post, p. 147.*)

7. SELF-DEFENSE. *By party in fault.*

An aggressor in a difficulty, whose act, in provoking and bringing it about, is of a character reasonably calculated to produce, and does produce, fear or apprehension of death or great bodily harm in the mind of his adversary, cannot lawfully defend his life against the deadly defensive act of his adversary by taking the latter's life, until he has restored his right of self-defense, lost by his initial fault, by abandoning and withdrawing from the contest, and. by word or act, giving notice of that fact to his adversary. Although such aggressor finds it impossible to abandon the contest and give notice of the fact, without peril or even loss of his own life, he cannot, even in that event, lawfully take the life of his adversary. The aggressor's act is, in such case, unlawful and felonious, and his adversary's act lawful and necessary, and the former as the guilty party, and not the latter, who is wholly innocent of any fault, must bear all unavoidable consequences flowing from his wrongful act. (*Post, pp. 147–152.*)

8. SAME. *Same.*

But the aggressor in a difficulty, whose act, in provoking and bringing it about, is not of a character reasonably calculated to produce, or does not produce, fear or apprehension of death or great bodily harm in the mind of his adversary, but consists of a simple assault, or assault and battery, attended with little or no violence, may lawfully defend himself. even to the extent of taking his adversary's life, against such fierce, deadly, and excessive force of his adversary as is reasonably calculated to inspire, and does inspire. in his mind fear or apprehension of death or great bodily harm. In such case the trivial initial fault of the aggressor, that did not threaten his

adversary with death or great bodily harm, will not be per-
mitted to cut off his right of self-defense against the fierce,
deadly, and excessive force of his adversary. The duty of
abandonment of the contest by the aggressor, and of giving
notice of the fact to his adversary, does not apply in such case
unless it may be done without peril to the life or limb of the
aggressor. (*Post, pp. 147–152.*)

9. CHARGE OF COURT. *As to grade of offense.*

The charge of the Court in a murder case sufficiently instructs
the jury as to grades of offense, which fully defines all offenses
embraced in the indictment, and instructs them to bring in
verdict, if they should find defendant guilty, for that grade
indicated by his status of mind at the time of the killing.
(*Post, p. 153.*)

Case cited: Draper v. State, 4 Bax., 246.

## FROM MAURY.

Appeal in error from the Circuit Court of
Maury County. SAM HOLDING, J.

ATTORNEY-GENERAL PICKLE and E. H. HATCHER
for State.

FIGUERS & PADGETT, GEO. T. HUGHES, J. C.
VOORHIES, and W. J. WEBSTER for Irvine.

BEARD, J. The plaintiffs in error stand con-
victed of the crime of murder in the second de-
gree, of one Cam Simmons. They are the sons
of Mrs. Mary Irvine, who was indicted with them,
as an accessory before the fact, but who was ac-
quitted.

The record discloses that after an angry meeting
with the deceased in the town of Carter's Creek,
on the border of which was the Simmons resi-
dence, Mrs. Irvine returned to her home, and re-
peated to her son, Warren, that the deceased had
greatly outraged her feelings, both by his manner and
in his speech.    Immediately upon getting this in-
formation, Warren sent a conveyance for his brother
Drew, who was then in an adjoining county, and
urged him to come at once.    The next morning
Drew returned, when the mother repeated to him
the story which she had already told the brother.
Very soon thereafter, the two young men, having
armed themselves, started to Carter's Creek to find
Simmons.    Having reached there they discovered
him, accompanied by one Wisener, walking down
the railroad track to his home, and intercepted
him when he was a short distance therefrom.    On
meeting the brothers, Simmons saluted them by
saying "Good morning, gentlemen."    No reply was
made to this salutation, save that Drew at once
struck him a heavy blow, which staggered him,
or "knocked him round," to use the language of
Warren Irvine.    This blow was given with the
right hand, which held a stone, that, according to
the testimony of Drew, was simply used as a
"cushion" for his fingers.    This was followed by
a number of blows from Drew, given in rapid
succession, with first one hand and then the other,

and delivered with great violence on the body of Simmons. In the meantime the latter retreated, and in doing so drew his pistol. According to the testimony of a number of eye-witnesses to the affray, as he was retreating under the effect of the blows from Drew, and before he drew his pistol, Warren Irvine fired one or two shots at him, when Simmons, having succeeded in getting out a revolver, fired at Warren, and by his shot brought him to the ground, and then turned his pistol and began firing at Drew. On the other hand Warren and Drew both swear that Warren did not fire at all, but fell paralyzed from the shot received by him, and did not participate in the rencounter. They also state that Drew, when he discovered that the deceased had disabled Warren, fell back several steps, retreating until he got out his pistol, and then returned to the combat; that he and the deceased then fired several shots at one another in rapid succession. All the witnesses agree that as Drew pressed forward, Simmons fell back, both firing, however, until their pistols were exhausted of their charges. As the result of this deplorable affray the three parties to it were wounded—Warren and Drew Irvine severely, and their adversary mortally.

On the action of the trial Judge a number of errors are assigned. The first of these is in his refusal to permit Mrs. Irvine to state what Drew

Irvine said to her as to the purpose of his trip to Carter's Creek, when he and his brother, mounted, were in the act of starting to seek Simmons. The theory of the defense is, that Warren was physically inferior to the deceased, and that he sent for Drew, on being informed by his mother of the alleged insult, because the latter was in strength the equal, and possibly, in athletic ability, the superior of the deceased, in order that he might chastise the latter in the event he failed to apologize for the affront; that while both went armed to the place of meeting, yet there was no purpose to use their weapons except their own lives were placed in jeopardy.

It was in support of this theory that the defense sought to introduce the excluded testimony. Mrs. Irvine testified that when her sons were mounted and in the act of riding away she entreated them to leave the deceased alone—not to seek him. In answer to these entreaties, she says Drew made this reply: "I am not going there to hurt anybody, or to get hurt by anybody. I want to go back to Franklin this evening to finish sowing my wheat. I feel like he (Simmons) has offered you a great insult, and having two able-bodied sons, I think they ought to defend you, but (and?) I would like to take my fists and give him a few of those licks he threatened to give you." And, again: "I am not going to shoot unless I have to do it in self-defense."

It is insisted that this remark or reply served to give a distinct color to the purpose of the ride that the young men were about to make, and at the termination of which this tragedy at once occurred, and was therefore competent as a part of the *res gestae*.

The rule seems to be well established that wherever the act of a party is in issue, and may be put in evidence, what he said at the time of doing the act, calculated to explain it or make that clear which otherwise might be doubtful, is equally competent. But the declaration must be so connected with the act as to make the two constitute one and the same transaction. When this concurrence takes place, then the declaration is but the articulate voice of the act. As a matter of course, there must be a main transaction involved, and only such statements as grow out of it and illustrate its character can be given in evidence. They must accompany the principal transaction, and derive their force from it, while, at the same time, they serve to elucidate it.

It is impossible to prescribe fixed limits for the working of this rule, as the transactions and the declarations with regard to which it may be invoked may cover a period of duration, longer or shorter, as the case may be. It is certain that it cannot be confined to any instant of time. All that can be said is, it must be simultaneous with the main transaction.

The rule, on the civil side, has been more frequently applied, say the text writers, in bankruptcy cases, where the question is as to the purpose of a party who is sought to be adjudged a bankrupt in going abroad beyond the personal jurisdiction of the Courts. In such cases his declarations, made when leaving home, and while absent, are held competent as a part of the *res gestae.*

In criminal cases it has had similar application. Where one was indicted for joining in a riot, the witness for defendant was allowed to state that he and the defendant were compelled to join the mob, but that in doing so they mutually agreed to make their escape at the first opportunity. *Rex* v. *Crutchley,* 5 Car. & P., 133. And in *Sawyers* v. *State,* 15 Lea, 694, it was held by this Court that where the State had proved that a defendant was seen going to and coming from the place of difficulty, it was competent for him to show what he at the time said explanatory of his conduct, as a part of the *res gestae.*

It must be conceded that the line between statements of the interested party which are competent and those which are incompetent, is sometimes hard to discover.

In the application of the rule of *res gestae* it is not possible in every case to remove all doubts. In the present case, however, we are satisfied in

reason and authority that this reply credited by the mother to Drew Irvine, should have gone to the jury. He was in the very act of starting on the ride of two or three miles which terminated at once in this fatal affray. He was armed, and going with his brother, who was also armed, to seek Simmons, in order to obtain some satisfaction for what he understood to be an outrage offered to his mother. Appearances indicated that this was a ride to a felonious assault, and it was important to him, as well as to Warren, that it should be shown not to be so. We think the transaction, which ended in so short a time with the death of Simmons, was in operation when this ride began, and that the alleged declaration, serving in some, though slight, degree to elucidate or illustrate it, was competent as a part of the *res gestae*. It should have gone to the jury, for them to determine what credit or importance was to be attached to it.

But while this is true yet the action of the trial judge in this regard cannot be made the basis for reversal, because Warren and Drew, when on the witness stand, both state, in effect, that the purpose of this ride to Carter's Creek was not to kill Simmons, but to chastise him if he did not apologize. In fact, we regard their testimony in this regard as being more favorable to the defendant, Drew, than the somewhat disconnected, if not inco-

herent, statement which Mrs. Irvine proposed to give in evidence.

It is further contended that the Circuit Judge erred in the admission of certain testimony of one Meroney, a witness as to character of the defendants. In answer to questions propounded by their counsel, he said he knew their general character up to the time of the killing, that it was good, and he would have given them full faith and credit. The witness was then turned over to the State, and the question as to the character of each of the defendants for truth and veracity "at the present time," that is, at the time of the trial, was propounded, and in reply he said "it is rather under a cloud since this last evidence." The question was repeated, but was then limited to Warren and Drew, and the witness answered, "It is bad now." He was then asked: "From that general character, as you now regard it and now know it, would you give them full faith and credit?" and the witness answered "I could not."

This testimony was excepted to because the witness had already disclosed the fact that it was based upon reputation growing out of the testimony in the very case then on trial. After a time the Court ruled as follows: "That portion of Meroney's testimony which had reference to change of opinion as to the general character of defendants, growing out of this case and trial, is ex-

pressly excluded from the jury, and they will not further consider it."

The necessary effect of this ruling (and the jury could not have understood otherwise) was to eliminate all that portion of the testimony of this witness which referred to an unfavorable change of public opinion brought about by the testimony of the defendants in the cause, and leave before the jury only the portion which was confessedly competent. It is insisted, however, that the trial Judge, in a later stage of the case, modified his ruling to an extent which left the objectionable testimony to work its mischief in the minds of the jury. We have examined the statement of the Court which provokes this criticism, and find ourselves unable to agree with it. The trial Judge, in that statement, was laying down a general rule for the future government in the examination of character witnesses. This was provoked, it is true, by the antecedent discussion with regard to the competency of so much of the testimony of Meroney as the defense deemed improper; but it was not intended to alter or modify the order of exclusion set out above, made especially in referene to that testimony. It was left, as was done before, with the unobjectionable portion in and the objectionable part out.

On the motion for new trial the defense introduced the affidavits of five jurors, who, in effect,

stated that a juror (Simmons), during the delib·
erations of the jury, and when a number of its
members were for acquittal, in urging a verdict
for guilty against all the defendants, stated that
"if they all knew  something he knew, and he
was allowed to tell it, they would come over to
him."   Simmons denies this general statement, but
admits ° that he did say, in regard to a strong
appeal for sympathy made by the counsel for the
defendants, that "if you knew what I do you
would have some sympathy on the other side, but
he was not allowed to tell it."   In this he was
corroborated by one member of the jury.

The jurors who made the impeaching affidavits,
do not pretend that they were influenced by the
remark of Simmons, or that during their delibera-
tions they attached the slightest significance to it.
On the contrary, they . say, while for acquittal
of the defendants, they yielded to the persistence
of those jurors who were for conviction, so far as
to agree to a verdict of murder in the second
degree, because thereby, as they knew, the defend-
ants, Drew and Warren, would be able to give bail
pending appeal.

In *Harvey* v. *Jones,* 3 Hum., 159, it is said:·
"This Court has repeatedly had occasion to com-·
ment upon the danger of setting aside verdicts·
upon the affidavits of jurors, and to declare that
it will be done only in extraordinary cases, and·

then with great caution." The wisdom of and the necessity for a judicious observance of this rule, is possibly more apparent to-day than when it was announced. Hardly a jury trial takes place in a case of any importance, whether civil or criminal, but that the privacy of the jury room is opened by a disclosure of what occurred there by one or more jurors in affidavits, which are made the predicate of a motion for a new trial. If the practice of hearing these affidavits is liberalzied, and the Courts depart from the rule of extreme caution, and then to be exercised only in extraordinary cases, the jury system is likely to prove abortive in putting an end to litigation. While verdicts have been set aside, and properly, when a juror has communicated to his fellow jurors facts bearing on the issue which were not adduced on the trial, yet we know of no case, where a mere suggestion of undisclosed knowledge was permitted to have such an effect. Such an assumption of superior knowledge on the part of a juror, however much it deserved rebuke from his fellow jurors, as an exhibition of bad taste, cannot be held to vitiate a verdict, especially when the complaining jurors say they were influenced to agree to a verdict by another and very unworthy consideration.

Again, it is insisted that errors were committed by the Court below, in the charge given to the

Irvine *v.* State.

jury, with regard to both Warren and Drew Irvine. With regard to Warren Irvine, the evidence of these two parties was to the effect that he accompanied his brother without any purpose of joining him in assaulting the deceased; but simply to protect Drew in his assault, if such was necessary; that Drew did not contemplate any felony upon, but simply personal chastisement of Simmons and that his (Warren's) intention was to prevent and interfere only in the event his brother should be beset by a superior force, and that he took no active part in the combat, having been disabled at the outset. The evidence of the State tended to prove conditions, so far as he was concerned, the opposite of these claims. But it is insisted that Warren was entitled to have the law properly applied to the evidence tending to support his theory of the case. The principle which his counsel rely upon and contend should have been given to the jury, is thus announced by Mr. Bishop, Sec. 439: "The true view doubtless is that every man is responsible criminally for what of wrong flows directly from his corrupt intentions, but no man intending wrong is responsible for an independent act of wrong committed by another. . . If the wrong done was a fresh and independent wrong springing wholly from the mind of the doer, the other is not criminal therein, merely because when it was

20 P—10

done he was intending to be a partaker in a wholly different thing."

That this principle is sound when applied to proper conditions, we take it would possibly not be questioned, but was there error in failing to apply it to the case upon which Warren seeks to rest it? We think not. There is no doubt that going to the village of Carter's Creek, as Warren avows, with the sole purpose to stand by and see Drew "beat" Simmons, and to kill only to save himself or brother if put in jeopardy of life or limb, while the chastisement was being administered, if Drew had of his own motion and without the countenance of Warren started a quarrel with a stranger and feloniously killed him, the latter, under this principle, would not have been liable. The fact of his original wrongful purpose, and of his mere presence when the other wrong was done, would not make him liable as an aider and abettor. Drew, in the case put, would have been the author of a "fresh and independent wrong springing wholly" from his own mind and executed by his hand alone. Not so, however, the present case. These brothers arm themselves for a joint enterprise. The purpose of both is that Drew, the stronger of the two, shall chastise Simmons, while Warren is to stand on guard while this is being done. Concede that this was the primary purpose of both, yet their secondary

Irvine *v.* State.

one was to kill if necessary. At every step in the working out of this unlawful undertaking, they were together, until Warren is shot down at his brother's side. The fact of being thus early disabled, cannot relieve him from the responsibility as an aider and abettor. In such case the rule is that "all those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime." 1 Whar. Cr. Law., Sec. 220. And this rule, in effect, was properly given in charge to the jury.

Again, it is insisted that the trial Judge failed accurately to apply the law to the theory of the defense. That theory is this, that in carrying out the purpose of the plaintiffs in error, Drew was inflicting corporal punishment on the deceased, when he (Simmons), being also armed, instead of repelling the attack with his fists, did so unnecessarily with a pistol, with which, in his turn, he became the assailant, putting Drew in peril of his life or limb so that to save himself he had to take the life of the deceased. In other words, that the resistance was disproportioned to the attack, and the deceased undertaking to repel a personal trespass, by the perpetration of a felonious homi-

cide, thus created in Drew the right of self-defense.

The trial Judge in this case, with unusual ability and care, instructed the jury. After stating in general terms the respective contentions of the State and the defense, he said to them, in effect, if they found that Warren and Drew Irvine, or either of them, made so violent an assault upon the deceased as to create in his mind a reasonable and well-founded apprehension that he was in imminent danger of death or great bodily harm, and, acting under this apprehension, he, with his pistol, made a counter deadly assault on them, they would not be justified in taking his life, unless first they had abandoned the combat and notified, by words or acts, their adversary that they had done so, and if they had not time to do this, then, being at fault, they must take the consequences; for as the deceased, acting upon the appearances created by their wrongful acts, would have been justified in slaying them, the defendants, whose fault created these appearances, could not make the legal acts of the deceased looking to his own defense, a justification for the homicide.

On the other hand, he charged the jury that if they should find that the defendants, or either of them, made a simple assault upon the deceased, intending little or no violence, and not of such

character or under such circumstances as to give the deceased reasonable grounds to apprehend death or great bodily harm, and this assault was met by the deceased with a counter deadly assault, and with a deadly weapon, the right of self-defense was not lost to the defendants.

We cannot conceive how the trial Judge could more clearly have given the theory of the defense to the jury. He, in this portion of the charge, recognizes that the force of resistance must be proportioned to the character of the attack, that the commission of a mere trespass—as to beat a party—would not justify the killing of the aggressor (*U. S.* v. *Wiltberger,* 3 Wash. C. C., 515; 1 Wh. Cr. L., Sec. 484), and told the jury that if the attack of the defendants was of this character, then the deceased had no right to repel it with a deadly weapon, and, if he did do so, then the assailants were at once remitted to the full right of self-defense.

Thus the rule that the mere unlawfulness of an attack did not deprive the aggressor of his right to slay the assailed party, if this party, in his turn, in a manner disproportioned to the character of the assault, put in jeopardy, or on reasonable grounds appeared to do so, the life of the assailant, was distinctly announced.

On the other hand, with equal emphasis and intelligence, he told the jury that where the as-

sailant, by the violence or fierceness of the attack, put the assailed party in danger of felony to life or limb, or gave him reasonable ground to suppose that he was in such danger, then the latter had a right to draw a deadly weapon and slay if necessary, and the former could not kill in his own defense, unless he had first withdrawn from the combat, and by word or deed given the assailed notice of such withdrawal.

These instructions embraced the law and fit to a measure the respective theories advanced, leaving the application of the law to be made by the jury as they might find one or the other supported by the credible testimony in the case.

Nor are we able to say that the jury were unwarranted in the finding of facts or that they misapplied the law thereto. Upon the testimony of the defendants, their assault was sudden, violent, and was continued on the part of one to the fatal wounding of the deceased. Seeking, they confronted Simmons when pursuing his peaceful way on the Sabbath morning to his home near by; in answer to his greeting, "good morning, gentlemen," given evidently without bravado of tone or manner, Drew strikes him, with his right hand, the fingers of which covered a stone, so violent a blow in the pit of the stomach that, to use the words of Warren, it "turned him around," following this with a series of blows delivered in

quick succession alternately with the left and right fist upon the face, breast and stomach of the deceased, under the force of which the latter fell back—the whole succeeded by a murderous discharge of firearms, resulting in the serious wounding of the two Irvines, and the death of Simmons.

It is true that plaintiffs in error state the deceased drew his pistol first and fired the first shot, and that, discovering this, Drew ·fell back a few steps until he ·could get out his revolver. On the other hand, the witnesses for the State, swear that while Drew was driving Simmons back with heavy repeated blows, Warren drew his pistol and fired at his adversary once or twice before Simmons drew his. Such was the statement of the deceased in his dying declaration, and we think without analyzing it the overwhelming weight of the evidence is that way. At any rate this issue of fact was submitted to the jury, and by them was settled against the plaintiffs in error. But concede that we should find the weight of evidence on this point was with them, could it avail them? On the facts developed in this case, could they, or either of them, justify the slaying of Simmons? Had he . not reasonable ground to suppose that he was in jeopardy of life or limb, and, believing so, had he not the right to repel his assailants with a deadly weapon? We think so. If so, then as the trial Judge told the jury,

having by their wrongful acts created this appearance or ground, they could not justify themselves for killing Simmons, until they showed in good faith a withdrawal and notice of such withdrawal to their adversary.

According to the great preponderance of the testimony, the mother of these parties, in the quarrel of the day before, had threatened the deceased that she would have Drew come and scatter his brains upon the railroad track, and as if in answer to her summons, Drew suddenly appears supported by his brother, and without a demand for an explanation or apology, and declining to acknowledge the peaceful salutation of Simmons, at once begins his violent attack. Could the deceased think otherwise than that these young men had thrown themselves across his path to make good the threat of their mother?

There is another consideration which gives additional force to the contention of the State, and that is, the plaintiffs in error challenged the fight and went to it armed. If at the beginning of a combat one prepare a deadly weapon so as to have the power and with the preconceived design of using it in some part of the contest, if an emergency arises, he cannot justify himself if he slay his adversary. Wh. Cr. L., Sec. 476. It is true the deceased was also armed, but this adds no strength to the position of plaintiffs in error, for

Irvine *v.* State.

he did not seek the combat; it was forced upon him.

But it is also said that the trial Judge nowhere gives an instruction which assigns a proper grade to the act of killing in the event the jury should find it unlawful. This objection is not warranted. In the opening of his charge there is a definition of murder in the first and second degree, and of voluntary manslaughter, and the jury were told the constituent elements of each of these offenses. In *Draper* v. *State,* 4 Bax., 246, a complete definition of the offense of manslaughter in the beginning of the charge was held to be sufficient, although there was not so full a definition in a subsequent part of the charge. But here the trial Judge was not content with this general definition. Coming to state the contention of the State as to the facts as hereinbefore summarized, he said: "And if under such circumstances the defendants killed deceased, they would be guilty of either murder in the first or second degree or voluntary manslaughter, according to the mental states of defendants, as you may determine from all the facts and circumstances, that is to say," and then follows once more accurate definitions of these offenses with the penalty attached to each.

After a painstaking examination of the immense record, we are unable to find any error, and the judgment of the lower Court is affirmed.