JOHN GARDNER and WALTER HUNT *v.* STATE.

(*Nashville.*    December Term, 1908.)

1. **CHANGE OF VENUE.** Affidavits held to be sufficient to require a change of venue in a criminal case.

Affidavits as evidence in support of an application for a change of venue in a criminal prosecution are stated, considered and held to be sufficient to show great improbability of defendants obtaining a fair trial in the county where the alleged offense was committed or in any adjoining county, and that, therefore, a change of venue should have been granted, and granted to the nearest adjacent county free from the objectionable causes, which the defendants may have selected. (*Post, pp.* 688-706, 714.)

Code cited and construed: Secs. 7159-7162 (S.); secs. 6025-6028 (M. & V.); secs. 5195-5198 (T. & S. and 1858).

2. **SAME.** Same. Upon reversal and remandment for error in refusing the change of venue, the supreme court will direct the transfer of the cause.

Upon reversal and remandment of a criminal case, because of the error committed by the trial judge in refusing to change the venue to the adjacent county selected by defendants, the supreme court will direct the lower court to transfer the cause for trial to such adjacent county. (*Post, p.* 714.)

3. **EVIDENCE.** Of the formation of a law and order league is inadmissible in prosecution for murder.

In a prosecution for the murder of a person who was a member of the night riders, an organization alleged to have been formed for the purpose of forcing tobacco raisers to join the Planters' Protective Association, by destroying the property of persons who were not members thereof and by committing other acts of violence, evidence that a law and order league had been organized in the place where the defendants lived shortly after the killing of the deceased is irrelevant. (*Post, p.* 707.)

Gardner v. State.

4. **SAME. Of statement of witness as to leaving neighborhood after the killing is inadmissible when.**

In such prosecution, a statement made by a witness that, after the murder, for the commission of which the defendants were arrested, he left the neighborhood where he was living because he wanted to get away from the night riders, is not admissible, for the reason that it is irrelevant and too remote from the issue. (*Post, p.* 707.)

5. **SAME. Rejection of evidence subsequently admitted is not prejudicial.**

Where evidence rejected is afterwards substantially introduced and admitted in a subsequent part of the examination of the same witness, such rejection was not prejudicial. (*Post, p.* 707.)

6. **SAME. As to Planters' Protective Association is inadmissible in prosecution for murder of a night rider, when.**

In a prosecution for the murder of a member of the night riders, an organization alleged to have been formed for the purpose of forcing tobacco raisers to join the Planters' Protective Association, evidence to .prove the charter of the protective association, its special form of organization, its character, and volume of business is inadmissible because too remote. (*Post, pp.* 707, 708.)

7. **SAME. Evidence is to payment of attorney's fee by such association not concerning night riding is inadmissible in such prosecution when.**

In such prosecution, evidence as to money paid to an attorney by the said association as his fee for defending certain members thereof charged with malicious threats under the statute is inadmissible, where it does not appear to have been concerned with night riding, although the attorney, in answer to a question, said that the people spoke of them as night riders. (*Post, p.* 708.)

8. **SAME. Of subsequent murder is inadmissible in a prosecution for a prior murder.**

In a prosecution for murder, evidence as to a subsequent murder is inadmissible, because it will throw no light upon the issues to be tried in the pending case. (*Post, p.* 708.)

9. **SAME.** In a prosecution for the murder of a night rider, evidence as to the character and methods of the night riders, is admissible when.

In a prosecution for the murder of a member of a band of night riders, an organization alleged to have been formed for the purpose of forcing tobacco raisers to join the Planters' Protective Association, where the theory of the defense was that the defendants were assailed by a band of night riders and they fired in self-defense, evidence was admissible, tending to show the existence of a band of night riders, its organization and purpose; that in carrying out its purpose, the night riders had terrorized the surrounding country by destroying tobacco plant beds, sending threatening letters, riding through the country masked and armed, and had committed other acts of violence; that they had threatened violence to and had actually raided certain towns; that they had threatened the city of Clarksville so ominously that the citizens thereof had organized for defense; that defendants had been engaged as guards to repel their threatened attacks; that, on the night of the murder, a telephone message was sent to the chief of police of said city that a body of night riders had started towards said city; that the sheriff was notified, and refused to take any action; that the people along the line they were expected to travel, not in sympathy with the night riders, needed help; that thereupon the defendants and several others were sent out to assist the people, and to arrest the night riders, if they could; that they all proceeded into the neighborhood from which the telephone message had come; that shooting was heard a short distance further on; that the Clarksville party then proceeded in the direction from which the shots apparently came, but did not overtake or discover any night riders; that defendants were posted on the cross-road where the homicide subsequently occurred; and where there was evidence tending to show that all of the foregoing facts were known, in a general way, to the plaintiffs in error, all the foregoing evidence was admissible as tending to develop all of the facts; so as to give the jury a comprehensive idea of the

Gardner v. State.

organization defendants had to deal with, and the situation in which the defendants were placed. (*Post, pp.* 708-714.)

10. CONSPIRACY.  Each member of a conspiracy is responsible for the acts of each and all the members thereof.

Where the evidence shows a conspiracy, existing among two or more men, or a body of men, to do an unlawful thing, the body of men, attains the distinctive character of an individual, and each man contributing to the composition of the body is, in general, responsible for the acts of all the members composing the body in prosecution of the enterprise in which all are engaged, or in furtherance of the object or common design of the conspiracy. (*Post, p.* 713.)

Cases cited and approved:  Jackson v. State, 6 Bax., 452; Little v. State, 6 Bax., 491; Irvine v. State, 104 Tenn., 132, 145-147; Standard Oil Co. v. State, 117 Tenn., 618, 673.

11. EVIDENCE.  In prosecution for murder of night rider, connection with another association may be shown to develop the purpose of the night riders.

In a prosecution for the murder of a member of a band of night riders, an organization alleged to exist for the purpose of forcing tobacco raisers to join the Planters' Protective Association, evidence to show a connection between the two organizations is admissible, but only so far as to fully develop the nature and purpose of the night rider's organization; and the extent to which the inquiry may go depends largely upon the discretion of the trial judge as the investigation proceeds. (*Post, pp.* 713, 714.)

FROM MONTGOMERY.

Appeal in error from the Criminal Court of Montgomery County.—C. W. TYLER, Judge.

DANIEL & DANIEL, LEECH & PONDER, W. D. SUGG, and M. H. MEEKS, for plaintiffs in error.

ATTORNEY-GENERAL CATES and SAVAGE & FORT, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiffs in error were indicted in the criminal court of Montgomery county, charged with the murder of one Vaughn Bennett. They were convicted of murder in the second degree and sentenced to ten years' confinement in the State penitentiary. From this judgment they have appealed to this court, and assigned errors.

The first matter to be considered is the action of the court on the application of the plaintiffs in error to change the venue.

The grounds stated in the application were as follows:

Firstly. That there is "such undue excitement and prejudice against defendants" in Montgomery county, and the adjoining counties of Robertson, Cheatham, Dickson, Houston, and Stewart, "that a fair trial cannot be had in any of said counties."

Secondly. That in all the aforesaid counties mentioned, there has been such agitation and inflammatory discussion of the charge against defendants by members of what is known as the Planters' Protective Association, both in the press and otherwise, that there has re-

sulted intense prejudice against them, "and such a state of feeling against them as renders a fair and impartial trial in any of said counties improbable and impossible."

In support of this application the plaintiffs in error filed one hundred and thirty-seven affidavits. Nothing was produced by the State to the contrary.

The affidavits filed by the plaintiffs in error themselves we here set out.

"Defendants state that there is such violent prejudice and undue and unreasonable excitement against them because of said alleged offense in said county, and in the tobacco-growing counties adjoining said county, that it is impossible for them to obtain a fair and impartial trial in Montgomery county, or in any of said tobacco-growing counties. There exists in all of said counties of Tennessee, and in many counties adjoining Southern Kentucky, an organization known as the Planters' Protective Association of Kentucky, Tennessee, and Virginia. In its legal character this is nothing more than a corporation under the law of Kentucky with the capital stock of two hundred shares of the par value of $1 per share; but in its practical operation it is an association of farmers who grow tobacco in the different counties of what is known as the Black Patch in Kentucky and Tennessee. Each county has an organization composed of district chairmen and a county chairman, and the members of the association sign pledges for a given time for the handling and sale of their crops

121 Tenn—44

of tobacco through the said corporation, and every two weeks on Monday the members of each county meet at the courthouse or in some other public place—in some counties not as often—and are frequently addressed by speakers. It is a well-known fact that for two years or more it has been the purpose of the organization to number in its membership all the tobacco growers in the Black Patch, and that for this end there has been much violence and crime committed in many counties in Kentucky and Tennessee in the way of seeding and scraping plant beds, destruction of crops and other property, burning of barns, whipping of people, and shooting and killing. For these unlawful purposes, it is a matter of common knowledge that there has grown up in said counties a secret organization known as night riders, and so notorious is this fact that in a speech made by the governor of Kentucky, in Louisville, on March 30th, to a meeting in favor of law and order, referring to this organization, he said: 'This is an oath-bound organization that goes on rides. I am not guessing. I know. It is bound by a death oath, and I know that oath.'

"This statement has been recently confirmed in the trial of a night rider case in Calloway county, Ky., by one who claimed to belong to such organization testifying to the oath in the following words:

" 'In the presence of Almighty God and these witnesses, I do solemnly promise and swear to become a member of this order. I do solemnly promise and swear that I will not reveal or cause to be revealed the secrets

Gardner v. State.

of this order by signs, acts, or writing.  I do solemnly
promise and swear that I will obey all orders that are
given me by the captain, and I will go at any time I
may be called upon, unless I or my family are sick,
and if I should betray this order in any way I shall
have to submit to the penalty which may be put on me,
which is death.  To all this I do solemnly promise and
swear.  So help me God.'

"For a week preceding the alleged offense with which
defendants are charged, in the eastern and northern
portions of Montgomery county, a band of night riders,
with exception of one night, as defendants are informed,
had been riding about at night armed and masked, whip-
ping people and destroying property in that portion of
the county; and the said Bennett brothers were mem-
bers of such a band, armed and masked, engaged in
such lawlessness on the night of March 9th, when it
is alleged that said shooting and killing took place; and
offenses of like nature have been a matter of not uncom-
mon occurrence by night riders in said county for more
than a year prior to that time; and such lawlessness
has prevailed to such an extent that it has resulted in
a reign of terror and intimidation in the county, a fact
well known to every citizen in the county.  Defendants
say they are not guilty of the crimes charged against
them, but that the charges against them were immedi-
ately taken up by members of said association, and have
been made an association matter in their public meet-
ings and in publications published in the interest of said

association. Guthrie is in Todd county, Kentucky, a county adjoining Montgomery county, Tennessee, and the first issue of a paper known as 'the Tobacco Planter' was issued at that point, on March 19, 1908. This paper is a weekly, and circulates among the members of the association, and claims to be and is recognized as an organ in its interest. The following extract from said first issue shows how this matter was viewed by the members of the association in the public meeting held at Clarksville, Tennessee, soon after the said shooting and killing occurred:

" 'The meeting of the Montgomery county organization of the Planters' Protective Association, held in Clarksville on Monday, was one of the largest attended and most enthusiastic ever held. An unusually large number of farmers was present, and the meeting completely filled the courtroom and overflowed in the corridors of the building. The interest in tobacco matters had been at fever heat throughout the county since the assassination of Vaughn Bennett at Port Royal on the previous Monday, and but few members of the association neglected to attend the meeting.'

"On May 3d the grave of Vaughn Bennett, deceased, was decorated, and a large gathering of people was present. A description of this occasion is furnished by the following communication published in the Daily Leaf-Chronicle of Clarksville, May 2, 1908, in the following words:

" 'The decoration of Vaughn Bennett's grave last

Gardner v. State.

Sunday afternoon was witnessed by at least 1,000 people. Friends from Guthrie, Sadlers, Adams, Cheatham, and Montgomery counties, participated in the event, and each section was largely represented. The designs were numerous and elegant. Never have we seen such a large collection of flowers at any country place for one grave. Not only was Vaughn's grave covered with beautiful flowers, but those of his two brothers, who had died previous, were covered also. This fact alone shows that Vaughn Bennett was beloved and held in high esteem by the people that showed him this act of love and respect. The Woodmen participated in the decoration, and their floral offerings were beautiful and appreciated; but the decoration was not under the auspices of the order, as was stated, but by the people who loved the cause he served. Mr. Ed. Webb and Mr. Hogan both made appropriate and impressive talks. Rev. Adair offered a beautiful prayer, and two lovely songs were sung. The memory of this occasion will long be remembered, and Vaughn Bennett's memory will not be a passing shadow, but treasured in the hearts of many, and will pass into the ages as an event of history that he lost his life for the cause of the people.

" 'Port Royal, May 8th.  A FRIEND.'

"On the same subject, in a quarterly magazine purporting to be published by the Black Patch Publishing Company, at Springfield, in Robertson county, Tennessee, and claiming to be devoted to the interest of the Planters' Protective Association, called the 'Black Patch

Journal,' appears the following article with the picture of both Vaughn and Earle Bennett:

" 'THE BENNETT BOYS.

" 'Near Sango, in Montgomery county, Tennessee, Vaughn Bennett sleeps. He died the victim of the vengeance of the merciless Tobacco Trust infused in double portion into its paid midnight assassins. On the Sabbath day, May 3d, a thousand men, women, and children gathered from many miles around to drop a tear and lay a floral tribute upon the green mound that marks his last resting place. A few strangers were present, not to lay forth a tribute on the grave, not as a mark of respect for the dead boy, but as curious onlookers and as spies. When men and women stand at the grave of a friend and comrade, they desire to be surrounded only by friends, that they may think seriously on life and death, and sweetly of the memory of the dead friend. The strangers were asked to go their way.

" 'The flowers that were deposited over the grave of young Bennett would have filled a room. Such a floral tribute has never been seen in Tennessee. Bennett's father and mother are influential and highly respectable citizens. They are well-to-do, and are amply able to erect a monument over their son; but they have deferred to the request of the young men of the community that they be allowed to erect a princely marble over their fallen friend.

" 'On the fatal night of March 9th last, there lay ambushed in a plum thicket near the home of Bennett

Gardner v. State.

about a dozen men, if it be proper to call them men, and as Vaughn Bennett and his brother, Earle, rode toward their home, these murderers fired upon them, and Vaughn Bennett fell dying from his horse. Earle Bennett, though desperately wounded, escaped with his life. When the cover of night that hides the crimes of men had been lifted by the morning sun, there was presented a ghastly scene that stirs men's blood. Vaughn Bennett lay dead in the road. Near him his horse lay dead, and still a little further on lay the dead horse that had been ridden by his brother.

" 'The Bennett boys were exemplary and highly respected young men. They were enthusiastic members of the association, and to the just man this is not a crime. It has been unsuccessfully asserted that they had been on an unlawful mission, but no one seems to have suffered that night but the keeper of a morally disreputable house. Whether these boys had anything to do with that we do not know, but that did not warrant men in no manner connected by consanguinity, affinity, or otherwise, with such immoral landlord and lady to take their lives an hour or two thereafter.

" 'The names of the men who killed Vaughn Bennett are known to a good many people. The route they traveled to the plum thicket, the kind of horses they drove, the vehicles they rode in, and where they came from, is also known. But as yet the arch conspirators in this sad midnight tragedy have escaped indictment at the hands of the law.

" 'The veil of mystery may hang forever over this scene. Truth may never come to light and justice prevail; but it is certain that the pall of gloom and midnight of sorrow will not be lifted from a mother's heart till she shall be reunited with her son across the river.'

"The governor of Tennessee had offered rewards aggregating $4,000 for the arrest and conviction of parties guilty of such crimes; that because of this fact prominent members of the association in a public meeting at Clarksville had censured and criticized him, and had appealed to the members of the association never thereafter to vote for him.

"These offenses for which rewards were offered were charged to have been committed by members of the association.

"At a meeting of the members of the association on Monday, February 18, 1908, the president of the association, Charles H. Fort, addressed the meeting, and in the course of his remarks saw fit to speak of the well-known condition of lawlessness prevailing in Montgomery and the other tobacco-growing counties, and referring to the night riders charged with such lawlessness, he is reported in the Clarksville Leaf-Chronicle of February 18, 1908, to have used this language:

" 'Mr. Fort referred to reporters of newspapers in regard to the lawlessness that had been practiced. He told of the visit of a reporter to his home, and many interrogatories, to which he had only one answer, and that was he believed the Lord sent down these fellows to do

Gardner v. State.

work that seemed that was tending to make the principles of the association more closely guarded and adhered to by all.'

"All the foregoing matters in the way of publications and statements in public meetings are presented to the court's attention for the purpose of showing the actual condition of things in Montgomery county and the other said counties to such an extent as to make a trial of defendants in any of said counties a travesty on justice. To further show the conditions, defendants state that in the last two years a night-riding raid was made on Princeton, Hopkinsville, and other towns in Kentucky, resulting in the burning of large amounts of property and shooting up of the town, and that since the raid on and shooting up of Hopkinsville, in December, 1907, it has been a well-known fact that a like raid was contemplated upon the city of Clarksville by the night riders; that because of the well-grounded apprehension of such raid [on] the city of Clarksville, the county of Montgomery, through its proper official, and the citizens of Clarksville, immediately after the Hopkinsville raid, took the precaution to guard and protect the city of Clarksville against such raids, and that after the alleged shooting and killing of the Bennett boys it became necessary to increase the defense of the town, the feeling against the town having become much more intense and bitter after that event—this being due to the fact that defendants resided in the city of Clarksville. The city is still compelled to maintain an expensive

guarding against such threatened invasions. Defendants state that practically all tobacco growers in Montgomery and adjoining counties are members of said association, and that the agitation to the prejudice of defendants has been so bitter and persistent, and is still so bitter and determined, that it has affected not only the members of the association, but has also affected and worked upon the fears of practically all the people in the different vocations of life in said county and adjoining counties to such an extent as to render a fair and impartial trial of defendants not only improbable, but impossible, in said Montgomery county and the tobacco-growing counties adjoining.

"[Signed] .                          W. D. HUNT,
                                     "J. M. GARDNER."

C. P. Warfield, after referring to a former affidavit made by him, continues:

"Since the making of said affidavit affiant states that there has been a race and election for sheriff in Montgomery county, which plainly indicates the sentiment against the enforcement of law for crime in any way identified with what is known as the tobacco situation —that is, from such offenses as are perpetrated by night riders in the interest of what is supposed to be for the benefit of the tobacco association by those committing such offenses. In said former affidavit affiant has indicated the lawlessness referred to and the utter lack of the detection of same and punishment of same in the courts. Harry E. Dowlen was a candidate for sheriff

at the recent August election upon the plain and distinct platform that, if elected, he would see that the law was enforced, and his candidacy upon this platform aroused such intense opposition, as is a well-known fact, that intimidation of voters prevailed throughout the county, and that a great body of voters who desired to see the laws enforced were afraid to go to the polls and vote their sentiments. Affiant, during the progress of the race for sheriff, talked with many citizens throughout the county on the subject of enforcing the law and the necessity there was for electing a sheriff that was pledged to do so, and he found that the sentiment for law enforcement and the electing of such a sheriff would not be expressed at the polls because of the intimidation of the voters. He is informed and states the fact to be that many citizens throughout the county received threatening letters from unknown persons warning them against voting for Dowlen, and that there was a general fear upon the part of many citizens throughout the county to take interest in and vote for said candidate was a well-known fact during the contest for sheriff. The result of said contest was 2,741 votes for the opponent of Dowlen, and 578 for him; and this result confirms the state of intimidation that was known to exist before the election took place. Of this 578 received throughout the whole county, 372 came from the twelfth civil district, in which the city of Clarksville is located."

The other affidavit referred to is as follows:

"C. P. Warfield states that he is fifty-six years of age, and has lived in Montgomery county all his life; that he has represented said county once in the lower house of the general assembly, and that county and Robertson twice in the State senate; that he has been a tobacco warehouseman in the city of Clarksville for twenty years, and is now, and that he is familiar with the tobacco situation and its aspects in the counties of Tennessee and Kentucky constituting what is known as the Black Patch; that for a little over a year, ending in the spring of 1906, he was the general salesman located at Clarksville for what is known as the Planters' Protective Association; that said association in its legal aspects is a Kentucky corporation for the handling and selling of tobacco, and in its practical workings is an association of farmers who sign pledges for the handling and selling of their tobacco through said corporation, and hold public meetings in the different counties in Kentucky and Tennessee; that the county organizations consist of district chairmen and a county chairman, the latter being ex officio presiding officer in the public meetings.

"Affiant states that he is acquainted with the state of feeling in Montgomery county and adjoining tobacco-growing counties against the defendants, Walter Hunt and John Gardner, charged under indictments in Montgomery county with the killing of one Vaughn Bennett and the shooting with intent to kill one Earle Bennett in said county on the 9th of March last, and he states that

there is such undue excitement over this occurrence and such violent and unreasonable prejudice against said defendants that he does not think that a fair and impartial trial could either probably or possibly be had in Montgomery or said adjoining tobacco-growing counties of Robertson, Cheatham, Dickson, Houston, and Stewart. In Montgomery, Robertson, and Cheatham practically all the farmers grow tobacco and belong to said association, and in the other counties it has a very large membership in proportion to the population of the counties, and its influence extends to and has the sympathies practically of all the people engaged in other vocations in all of said counties, in its declared purposes to advance the tobacco interests of said counties.

"Affiant states that in publications issued in the interest of said association that circulate in said counties, and in public meetings of the said association held in Clarksville, Montgomery county, since March 9th last, the matter of the shooting and killing of the said Bennetts has been much agitated and discussed, and the feeling displayed against defendants, charged with the offenses aforestated[sic], has been strong and bitter, and the said killing and shooting has been made a matter of association interest, and this has resulted in such bitter prejudice against said defendants throughout Montgomery and the other counties named to such an extent as to affect prejudicially defendants and to terrorize by fear the people in said counties to such an extent that a trial of said defendants in any of said counties could not

be had with any show of fairness; that he does not think jurors of fairness sufficient and courage sufficient could be had in any said counties to fairly and impartially try defendants under the indictments pending for said killing and shooting.

"Affiant states that it is a well-known fact that for at least two years it has been the purpose of said association to number among its members all the tobacco growers in the Black Patch in Kentucky and Tennessee; that there has grown up in said section in Kentucky and Tennessee what is known as the night riders' organization, and that such night riders have by scraping the plant beds, destruction of crops and other property, the burning of barns, and the raiding and shooting up of towns, the whipping of people and other acts of violence, endeavored to force into the membership of said association the tobacco growers in many of the counties of Kentucky and Tennessee, within the Black Patch; that for more than a year prior to March 9th last, there had been committed in Montgomery county a very great number of crimes in the way of plant bed scraping, the pulling up of tobacco crops, the burning of barns and other properties, blowing up machinery, the whipping of people, etc., and such lawlessness has continued up to date, and so far the law has been powerless and helpless for the detection and punishment of such lawlessness; that such lawlessness is well known to be the work of the night riders, and it has resulted in a state of fear

and terror among the people throughout the county, and such condition of things now exists.

"Affiant knows the fact to be that since the night riders began to operate that they have raided the towns of Princeton, Russellville, Hopkinsville, and other towns or villages in Kentucky, and burned property and shot up such places; that since the raiding of Hopkinsville and burning warehouses in said city in December, last, it has been necessary for the owners of warehouse property and dealers in tobacco in Clarksville and for the citizens of the town and the officials of the city, the county for a time having joined in such means of protection, to [unite in] the contribution of a given sum per month for that purpose, for a while, to maintain a guarded defense for the town for its protection against the raiding of the town and the destruction of life and property by such raiding; that after the alleged killing and shooting of the Bennett boys there were such threats and violent bitterness displayed and shown, not only against said defendants, but against the people of the city, from the fact that the defendants lived in said city, that it became necessary to increase the defenses for the protection of the town from being raided as was Hopkinsville. The situation became such that the governor of the state came to Clarksville, and, after conference with some of the county officials, he added to the strength of the defense that the city and the citizens were and still are maintaining, by placing as a posse, a portion of the military company of the city of Clarks-

ville, subject to the orders of a citizen of the city, and this posse is still being maintained.

"Affiant has gone into detail as hereinbefore set out as to the condition now prevailing in Clarksville and Montgomery county and throughout the tobacco sections mentioned in Kentucky and Tennessee, and their bearing on the cases against the defendants, as far as they in his opinion affect said defendants, for the purpose of showing why, in his judgment, it is neither probable nor possible that a fair and impartial trial can he had for the defendants in Montgomery county, or in any of said adjoining tobacco-growing counties.

"As further illustrating the lawless condition and state of intimidation and terror that exists in the county, and has been growing worse for the last two years, affiant states that many good citizens have brought to him anonymous letters, signed 'Night Riders,' threatening great harm to them and members of their families and 'destruction of their property; a great many of them being vulgar and insulting in language."

These statements are confirmed, as to the impossibility of getting a fair trial in Montgomery and adjoining counties, by the affidavits of W. F. Moore, M. H. Clark, A. F. Smith, W. F. Buckner, R. J. Ellis, J. F. Gracey, A. S. Rosson, Lewis E. Ladd, and E. F. Burgess.

The following affidavits are directed especially to the feeling in Robertson county, viz.: T. L. Polk, E. A. Hicks, J. M. Hill, Earnest Sory, E. T. Cook, O. B.

Batts, J. B. Sugg, R. L. Hill, J. H. Johnston, M. L. Johnston, R. H. Randolph, Joe Johnston, O. G. Sprouse, J. J. Orand, J. T. Latimer, J. B. Robertson, and Thomas Menees.   The following are directed particularly to the state of feeling in Houston county:   J. C. Hobbs, and J. N. Harris.   The following particularly to Dickson county:   J. H. Davis, Kirby Davis, and J. W. Cotter.  The following to Stewart county:   W. B. Edwards.   All other affidavits are directed to the state of feeling in Montgomery county.

We have seen that there are many affidavits directed to the condition existing in Montgomery and all the adjoining counties above named.   Some of the affidavits are fuller than others, but all of them show that owing to the condition of the public mind existing in the counties named there would be a greater improbability of the plaintiffs in error obtaining a fair trial.   It is particularly shown in these affidavits that the condition in Montgomery county is such that it would be difficult to find a jury that would feel safe in rendering a verdict of acquittal, even if they should believe the plaintiffs in error not guilty.

No effort was made in the court below to counteract these affidavits, and they must be taken as true.   Of course, under such a showing, it is clear that the prisoners were entitled to a change of venue.   Our Code sections upon this subject are as follows (Shannon's Code) :

"Sec. 7159.   In all criminal prosecutions the venue may be changed, upon the application of a defendant,

when it is made to appear satisfactorily to the court that, from undue excitement against the prisoner in the county where the offense was committed, or any other cause, a fair trial could not probably be had."

، As to the place to which the change is to be made, that is covered by the following sections:

"7160.   The venue shall be changed to the nearest county, either in or out of the judicial circuit in which the prosecution is pending, where the same causes do not exist.

"7161.   The defendant may elect to which county the venue shall be changed, when, in the opinion of the court, there are two or more adjoining counties, or counties about equidistant, to which the case might be removed under the provisions of the last section.

"7162.   If the defendant fail or refuse to make such election, the court shall determine to what county the cause shall be removed."

The plaintiffs in error asked, in the court below, that removal be had to Davidson county.

We think this request should have been granted, and the court below committed error in refusing to grant this change of venue.

In what has been said we have disposed of the first and second assignments of error.   We shall now refer to the remaining assignments so far as may be necessary.

We do not think it necessary to pass upon the third, fourth, fifth, sixth, seventh, eighth, and ninth assignments, concerning objections to jurors, because upon

the change of venue we do not think it at all probable that the questions referred to in these assignments could arise upon the next trial. The tenth assignment is overruled for the same reason.

The eleventh assignment is overruled, because we think the matter thereof is immaterial.

Assignments Nos. 31, 39, 42, and 54 are overruled. They relate to evidence tending to show that a law and order league had been organized in Clarksville shortly after the killing of Vaughn Bennett. We think this evidence is irrelevant. It does not throw any light upon the issues to be tried by the jury.

We think the thirty-fourth assignment should be overruled. This refers to a statement made by the witness Wilkerson to the effect that after the killing of Bennett, he left the neighborhood where he was living because he wanted to get away from night riders. We think this is irrelevant. It is too remote from the issue.

The thirty-sixth assignment is overruled. This refers to a mere application of a rule of practice, and the question is not likely to arise upon the next trial.

The thirty-eighth assignment is overruled. The matter complained of therein was substantially proven in a subsequent part of the examination of the same witness, although Robertson county, mentioned in the assignment, was not referred to by name.

Assignments Nos. 45, 46, and 47 are overruled. They refer to an effort to prove the charter of the Planters' Protective Association of Kentucky, Tennessee, and

Virginia, the special form of organization of that body, and its volume of business. We think these inquiries are too remote.

The fifty-third assignment is overruled. This refers to certain moneys paid to Mr. True by the association as his fee for defending certain members of the association charged with malicious threats under the statute. This does not appear to have been concerned with night-riding, although Mr. True says, in answer to a question, that the people spoke of them as night riders.

We think the fifty-fifth assignment should be overruled. This concerns the killing of Rufus Hunter, after the killing of Bennett. We do not think this circumstance would throw any light upon the issues to be tried in the present case.

The following assignments: Nos. 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 37, 40, 41, 43, 44, 48, 49, 50, 51, and 52—challenge the rulings of the trial judge on certain points of evidence. The action of his honor was not based upon the form of the several questions propounded, but upon the nature of the evidence offered. We do not deem it necessary to rule upon these several assignments seriatim, but shall only state our conclusions as to the admissibility of the classes of evidence referred to.

Plaintiffs in error were indicted for killing "Voyn" (Vaughn) Bennett. The evidence indicates that he was a member of a band of night riders, and that he was killed on one of the public roads of Montgomery county,

while on horseback, masked and garbed as a night rider, and armed, and with a band of persons similarly masked and garbed and armed. The evidence is conflicting as to the immediate facts attending the occurrence. The theory of the State is that the deceased was shot from ambush by plaintiffs in error as he was riding along the public road. The theory of the defense is that the plaintiffs in error were assailed by a band of night riders, numbering twenty-five or thirty, and they fired in self-defense, killing one, and the others fleeing. The evidence shows that plaintiffs in error were in a field on the side of the road, near the fence, at a point where a cross-road that passes by the houses of Woodson and Cooksey intersects a road known as the Through Spring road. To account for their presence at this point evidence was offered, some of which was admitted and some rejected, tending to shew the existence of an organization known as "Night Riders," operating in Kentucky and Tennessee—in Montgomery county, in this State, and neighboring counties in Kentucky— composed of numerous lodges, officered by "captains," "colonels," and a "general," all under one management, and having a common purpose; that the purpose was to force all tobacco raisers in the counties covering what is called the "Black Patch" in Kentucky and Tennessee to become members of the "Planters' Protective Association of Kentucky, Tennessee, and Virginia," an organization formed, as alleged, to control the price of tobacco in that territory; that in carrying out this pur-

pose the "night riders" had terrorized the whole of the section of country referred to, by scraping plant beds, sending threatening letters, riding through the country masked and armed, visiting the houses of people, shooting into houses occupied by women and children, forcing men out of their houses and beating them with switches, sticks, and fence palings, burning houses, barns, stables with live stock in them, and farm machinery; that in order to suppress opposition to the "Planters' Protective Association of Kentucky, Tennessee, and Virginia," by exterminating the business of the independent buying of tobacco, they had gone to the length of threatening a descent in force upon certain towns in Kentucky and Tennessee, had actually descended upon and raided certain towns in Kentucky, and among others had shot up the city of Hopkinsville; that they had threatened the city of Clarksville so ominously that the citizens had organized for defense, and a military company was kept there in readiness to aid the citizens; that the cause of hostility to Clarksville was the existence of the business of independent buying of tobacco there. There was evidence that the plaintiffs in error had been engaged as guards by one of the independent houses, also incidentally to assist in guarding the city from attack. There was evidence that a telephone message was sent into Clarksville informing the chief of police that a body of "night riders," fifteen in number, had started towards Clarksville about 10 o'clock on the night in question; that the sheriff was notified, and re-

fused to take any action; that the people along the line they were expected to travel, not in sympathy with the night riders, needed help; that thereupon the plaintiffs in error and several others were sent out to assist the people, and to arrest the night riders, if they could; that they all proceeded into the neighborhood from which the telephone message had come; that shooting was heard a short distance further on; that the party from Clarksville then proceeded in the direction from which the shots apparently came, but did not overtake or discover any night riders; that plaintiffs in error were posted by the man commanding the party, Mr. Sory, on the cross-road where the homicide subsequently occurred; that Mr. Sory and the others went to the next cross-road and stopped there, and awaited developments. There was evidence tending to show that all of the foregoing facts were known, in a general way, to the plaintiffs in error.

We think all of the foregoing evidence was competent. The situation was peculiar, perilous, and unprecedented in a time of peace. It was proper that the plaintiffs in error should be permitted to show and develop before the jury all of the facts, so as to give to that body a clear and comprehensive idea of the organization plaintiffs in error had to deal with—to trace its origin and history, prove its purposes, its method of operation, its spirit and nature. By this means the jury would be placed in the position of the plaintiffs in error, and see the situation as they saw it, and appreciate their posi-

tion when confronted, at night, by a superior force of such men. The jury would likewise be placed in a position to better determine who was guilty of the first overt act, in a case where the evidence was in conflict on that subject, as in the present case. This is very evident from the consideration that, when men go out upon the public road masked and armed, and garbed like night riders, thus proclaiming themselves as members of an organization widely notorious for its use of the cudgel, the shotgun, and the torch against the persons and the houses and the property of defenseless people, the very sight of them is a suggestion of danger, an indication of a lawless purpose, a ground and reason for instant and anxious alertness. The presence of a body of men so masked, garbed, and armed, or even of one man so accoutered, is an outrageous breach of law and order, and is an imminent and violent threat against all other persons who may encounter him or them, or against all other persons whom he or they may encounter. We do not say, nor do we wish to be understood as intimating, that the mere fact of one man or a band of men being so arrayed would justify other people in arming themselves and hunting them down and killing them; but it is quite evident that only a slight hostile movement from men so masked and garbed and armed would justify another person in instantly apprehending danger of death or great bodily harm at their hands. The principles, as applied to the apprehension that may properly be entertained in respect of a single antagonist of bad

and dangerous character who has uttered threats, whether communicated or uncommunicated, are set forth in the two cases, respectively, of *Jackson* v. *State*, 6 Baxt., 452, and *Little* v. *State*, 6 Baxt., 491. Where the evidence shows a conspiracy existing among two or more men, or a body of men, to do an unlawful thing, the body of men attains the distinctive character of an individual, and each man contributing to the composition of the body is, in general, responsible for the acts of all the members composing the body in prosecution of the enterprise in which all are engaged, or in futherance of the object or common design of the conspiracy. *Irvine* v. *State*, 104 Tenn., 132, 145-147, 56 S. W., 845; *Standard Oil Co.* v. *State*, 117 Tenn., 618, 673, 10 S. W., 705, 10 L. R. A. (N. S.), 1015 et seq. It is but fair, in such a case, to attribute to each member of the body the character of the whole body or organization, when measuring the rights of one who claims he has defended himself against its aggressions, and to that end to hear proof as fully as if the character and reputation of an individual man were under examination; the principle being broad enough to embrace the facts, consisting of acts and deeds, as well as the reputation of an organization extending over and operating in a wide section of country.

In some of the assignments above referred to, objection is taken to the action of the trial judge in refusing to permit the plaintiffs in error to show a connection existing between the night rider organization and the

"Planters' Protective Association of Kentucky, Tennessee, and Virginia." If such connection exists, we think it may be shown, but only so far as to fully develop the nature and purpose of the night rider organization. How far such inquiry may go must depend largely upon the discretion of the trial judge as the investigation proceeds.

Assignments Nos. 56, 57, 58, 59, and 60 contain objections made to the charge of the court below. We do not think it necessary to refer more particularly to these assignments, because we do not think there is any likelihood of a repetition of such error as there may be in any portion of the charge quoted.

The sixty-first, sixty-second, sixty-third, and sixty-fourth assignments present the point, in one form or another, that the evidence does not sustain the verdict. Since there is to be a new trial, we should forbear expressing an opinion upon the merits of the controversy.

From what has already been said, it is clear that the circuit judge committed error in refusing to change the venue to Davidson county, and also in the exclusion of competent evidence. The judgment is therefore reversed, and the cause is remanded to the criminal court of Montgomery county, with directions to transfer it for trial to the criminal court of Davidson county.