IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2004

## STATE OF TENNESSEE v. MICHAEL EDWARD THOMASON

**Direct Appeal from the Circuit Court for Cheatham County**
**No. 14091      George Sexton, Judge**

_____

**No. M2003-03072-CCA-R3-CD - Filed January 19, 2005**

_____

The defendant, Michael Edward Thomason, was convicted by a Cheatham County Circuit Court jury of first degree premeditated murder and sentenced to life imprisonment. In a timely appeal to this court, he argues that the trial court erred in its instructions on self-defense; the evidence was insufficient to show a premeditated murder; and the prosecutor made an improper comment in his closing arguments to the jury. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

William B. Lockert, III, District Public Defender; and Steve Stack, Assistant Public Defender, for the appellant, Michael Edward Thomason.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On October 12, 2002, the defendant shot and killed his former employer, Johnny Knight, at Knight's Sawmill on Poplar Ridge Road in Cheatham County. At trial, the victim's younger son, Randall Knight, testified that the victim hired the defendant in September 2002. Approximately one and a half to two weeks before the shooting, the victim sent the defendant as part of Randall Knight's work crew to Maine to dismantle some recently purchased sawmill equipment. While there, Randall Knight confronted the defendant several times over his failure to work, and, shortly before the completion of the job, they got into an argument over the defendant's poor work ethic. Afterwards, the defendant departed in the company truck, leaving Randall Knight and the rest of his crew

stranded at the job site, forty miles from their motel. Randall Knight testified that it took him a full day to find the truck, parked at the local bus station, and to get another key to it made.

The witness testified he informed the victim by telephone that the defendant failed to work and had stolen the company truck. He said the victim paid the workers' expenses while they were in Maine, but did not pay wages to those employees who had been hired by the job until the work was completed. He and the remainder of his work crew completed the job on October 12, and he flew home on October 13 after learning that the victim had been killed. On cross-examination, he conceded that the defendant had been the foreman at the job site, but he explained that he had been training the defendant to handle the work crew so that the defendant could take his place on future out-of-town projects. The witness acknowledged that the victim had given the defendant expense money for their Maine trip and that they had required additional expense money before the completion of the job. However, he was unaware the first expense check had "bounced" and had no idea how many times the defendant had had to request additional funds from the victim.

The victim's older son, John Michael Knight, testified he was the foreman of the victim's shop on Mount Zion Road in Springfield, Tennessee, where the Maine work crew had parked their personal vehicles before traveling together to the job site in the company truck. Between 8:00 and 9:00 a.m. on Saturday, October 12, the defendant arrived at the shop in a small red pickup truck driven by another man, inquired as to the victim's whereabouts, and left after the witness told him that the victim was probably at the Poplar Ridge sawmill. The defendant did not ask about his car, which at that time was blocked in by a company vehicle.

Gary Toothman, who operated a bulldozer for the victim, testified he saw the defendant at the sawmill between 8:00 and 10:00 a.m. on the day of the shooting. When he greeted him, the defendant told him the victim owed him money and he was there to collect it. Toothman said he saw the defendant hanging around the sawmill that morning, and later saw him walking toward an old house on the property. At approximately 2:00 p.m., Toothman was working a quarter mile down the road when several other employees of the sawmill drove up in their vehicles and informed him the victim had been shot. He then went to a neighbor's home and called 9-1-1.

Cheatham County Deputy Sheriff Carl Little testified he arrived at the sawmill at 2:27 p.m. and was headed toward a building with his shotgun drawn when the defendant, who was standing beside a red Chevrolet S-10 pickup truck with his father, called to him, raised his hands, and identified himself as the man for whom he was looking. The defendant additionally informed him that the weapon was in the truck, where Deputy Little found a .22 caliber pistol lying on the passenger seat. Deputy Little described the defendant as "pretty calm" during this time.

Investigator Travis Walker of the Cheatham County Sheriff's Department testified that, when he arrived at the scene, the victim was dead with obvious gunshot wounds to his face, head, and back. The victim had nothing in his hands, and Walker was unable to find anything that could be considered a weapon in the immediate vicinity of his body. However, a metal ratchet and a two-to-three-foot-long, yellow metal pole with an electrical cord attached, which he later learned was a laser

light used in the lumber industry for marking logs, were lying on the ground in front of an electrical box on the other side of a metal wall from where the victim's body was found. Investigator Walker said that he did not see a two-to-three-foot-long metal wrench in the area and that had he seen such an item, he would have collected it as potential evidence.

Investigator Walker testified he recorded the defendant's statement while still at the crime scene. In the statement, which was admitted at trial, the defendant said he had been forced to return to Tennessee when the defendant failed to send money to cover the Maine work crew's living expenses. The first time he tried to talk to the victim at the sawmill, the victim cursed him, refused to pay any part of his $5000 wages, and told him he would not let him get his car. The defendant stated he left the premises after the initial confrontation and sat down beside an old house on the property in order to calm down. During that time period, he also telephoned his father to return to pick him up. He then returned to the sawmill to try to talk to the victim again, hoping that the victim had also calmed down during the interim. When he approached the victim, however, the victim ran at him with a wrench in one hand and an object in the other. The defendant said he backed away from the victim but had no chance to escape and was forced to shoot to protect himself. He stated that he brought the gun with him for self-defense because the victim had threatened to kill him in an earlier telephone conversation and had the gun with him during his first confrontation with the victim. He denied he had planned the murder or ever intended to kill the victim:

> [THE DEFENDANT]: I had every intention of coming here and reasoning with him and getting money to go up there and finish the job. That's the reason why I stayed around as long as I did. I tried several, several times to talk to the man. I sent my Dad home because I didn't want my Dad to see any kind of ruckus or anything because I knew it would wind up that way. Maybe I should of [sic] left, I don't know, but I didn't have no [sic] way to leave. So I just settled down, hoping he would settle down and I would try to talk to him one more time. He come [sic] out of the sawmill with a wrench in one hand and something else in the other hand and come [sic] running at me. And I guess that's when I lost it. I done [sic] shot. He turned, I shot again, he went around the wall and I didn't, he's all ready [sic] threatened that he would kill me if I showed up. He has my car over there blocked to where I can't get my car.
>
> [INVESTIGATOR WALKER]: When you ran back around where was he, was he lying down?
>
> [THE DEFENDANT]: No, sir.
>
> [INVESTIGATOR WALKER]: He was . . .
>
> [THE DEFENDANT]: He still come at me. He come at me again.

[INVESTIGATOR WALKER]: How many times do you think you fired?

[THE DEFENDANT]: I know of twice. I don't know how many times I fired.

[INVESTIGATOR WALKER]: Where do you think you shot him at?

[THE DEFENDANT]: I just shot.

[INVESTIGATOR WALKER]: Because it looks like a possible, ah, couple face injuries, and there's one in his back. It went [sic] shot in the back. Did you, did you shot [sic] him running from you? Because there's no, it's an, it's an entrance wound, there's nothing coming out. There's nothing through [a]n[d] through. So just one shot that's directly in his back because he had to be running away from you when you shot him that one time.

[THE DEFENDANT]: I don't know. I don't recall. Everything is just a blur after the first shot.

[INVESTIGATOR WALKER]: You said you, he come [sic] out of the sawmill, where at in [sic] the saw mill [sic]?

[THE DEFENDANT]: He was in the, he was in the saw room itself. Up there where the controls are at. And I was off over to the to his left, standing on the ground. And he come [sic] out full run at me with a wrench in one hand. I know he had a wrench or I wouldn't have, I'd of [sic] just turned and run but he was coming after me. And he had done [sic] threatened he'd kill me if I showed to try and get any of my money or anything.

Investigator Walker identified a series of photographs of the crime scene, as well as a diagram of the sawmill, which were subsequently admitted as trial exhibits and referred to by various witnesses during their respective testimony. These reflect that the saw cab is an enclosed metal structure with windows that sits several feet above ground level. Below the saw cab, on one side, is a wooden platform or sidewalk, apparently a foot or so above the ground, which runs beside some electrical transformers and circuit breakers next to a graveled area. A metal wall separates the wooden sidewalk from the area, just beyond a green, metal "catwalk," where the victim's body was found sprawled among some logs.

-4-

On cross-examination, Investigator Walker testified that, based on his investigation, including the pattern of blood found at the scene, he believed the victim was standing on the gravel area when first shot and then stepped onto the wooden platform, made his way through an opening between some machinery to the other side of the wall, ducked beneath the catwalk, and was fatally shot just beyond the catwalk. He acknowledged that a metal object and a log appeared to partially impede the path under the catwalk and that there was an open area between some posts on the other side of some stairs. He denied that the physical evidence corroborated the defendant's account of having backed away from the victim before the first shots were fired.

Investigator Walker reiterated on redirect that, regardless of the possible alternate routes the victim could have taken, the physical evidence indicated that his path had led him beneath the catwalk as he made his way from the "two shot" to the "three shot side" of the wall:

> Q. You don't dispute the fact that - - that it's like we've learned in this case, there is [sic] a lot of different ways to get around all of these obstacles?
>
> A. Yes, sir.
>
> Q. Is that fair?
>
> A. Yes, sir.
>
> . . . .
>
> Q. I'll show you Exhibit No. 28, at this point in time.
>
> He would have had to - - As he came by there, after he staggered into the wall or grabbed the wall, there (indicating), he would have had to duck under the stairway, he could have gone that way?
>
> A. Yes, sir.
>
> Q. But that's not the way the facts indicate he went, is it?
>
> A. No, sir.

Dr. Charles Warren Harlan, the pathologist who performed the autopsy of the victim's body, testified that the victim received five gunshot wounds: one to the upper lip; one to the right side of the face at the right edge of the nose; one to the neck just below the tip of the chin; one to the front of the right ear; and one to the back. The gunshot wound to the ear, which was a near gunshot fired within zero to twenty-four inches of the victim's body, passed into the frontal lobe of the victim's

brain, rendering him immediately unconscious and causing his death. The remaining four gunshot wounds were classified as "distant," meaning that the bullets that caused those respective wounds were all fired from a distance greater than twenty-four inches from the body. All five gunshot wounds occurred "within a short time period of five (5) to ten (10) minutes," but Dr. Harlan said he was unable to determine the order in which they were inflicted. He said that the victim's blood tested negative for drugs and alcohol. On cross-examination, Dr. Harlan agreed that the four gunshots other than the fatal shot to the brain would not have incapacitated the victim and that he would have remained "fully functional" upon receipt of those wounds. He testified he was unable to determine whether the victim was lying down at the time the fatal wound was inflicted, but the victim could not have received the fatal wound in the exact position in which his body was found.

Albert Fuqua, who worked as a diesel mechanic for the victim, testified he first saw the defendant on the day of the shooting "fairly early in the morning . . . in the neighborhood of eight-thirty (8:30)" a.m. The defendant related to him some of the problems he had experienced while working in Maine, and told him that his car was blocked at the shop and he had come to get his pay from the victim. Fuqua saw the defendant several more times that morning and, at some point before lunchtime, saw him in a heated argument with the victim. At that time the victim was working on top of the track that carried wood chips from the saw to a trailer, and, although Fuqua could not hear everything that was said over the noise of the machinery, he heard the victim threaten to throw the defendant into the saw if the defendant came up where he was working. Fuqua said the defendant disappeared shortly after the argument, and that he thought he saw him leave in the Chevy S-10 truck. However, when the defendant reappeared early that afternoon, Fuqua did not see the truck.

Fuqua testified he heard the mill shut down as he and Johnny Henry, another employee, were stacking crossties and the victim was working in the saw cab above the ground. Henry told him the defendant had cut the power, and when Fuqua looked up, he saw the defendant standing beside the main circuit breakers. He next saw the defendant walk to a point where he could look directly into the saw cab, and, while holding a gun in one hand, beckon with the other hand for the victim to come down. Fuqua testified the victim came out of the cab and walked to the edge of the platform, and he and the defendant shouted angry words at each other. Toward the end of the argument, he heard the defendant say the victim would either pay him or he would shoot the victim and the victim reply that if the defendant were going to shoot him, to go ahead and shoot. Seconds later, the defendant fired two shots, with the first shot striking the victim in the jaw. After being shot, the victim began making his way through a narrow opening between a hydraulic unit and an electrical transformer. The defendant first looked around at the other employees in a threatening manner and then started off in the victim's direction. At that point, Fuqua fled to his truck and drove down the road to notify Toothman of the shooting. As he exited the premises, he passed the defendant's father, driving the Chevrolet S-10 truck, who was on his way in.

Fuqua testified he did not see the victim with anything in his hands before the first shot was fired. However, because the laser light was found after the shooting down in the gravel below where the victim had been standing, Fuqua thought it possible the victim had been holding it in his right hand and had thrown it down as he attempted to flee. He said the victim grabbed his mouth after the

first shot was fired, and he was confident the victim had nothing in his hands at that time. According to Fuqua's testimony, the victim had turned completely sideways at the time the defendant fired the first shot and appeared to be attempting to get away from the defendant. He testified: "The best way I can describe it is after . . . whatever [the victim] said, it looked like that [the victim] realized, there, that the [defendant] was going to shoot him. And that's when he turned and I'm going to -- in other words, that's what it looked like."

The victim's brother, Virgil Knight, who worked as a maintenance man at the sawmill, testified he first saw the defendant on the day of the shooting at about 10:00 a.m. He said the defendant approached the victim, saying he owed him $5000, and the victim replied that he did not owe anything because the defendant had not done any work. Thereafter, the men exchanged "bad words" for about two minutes, until the victim resumed sawing and the defendant left the sawmill. After about thirty minutes, the defendant returned and began walking around the saw cab, peering through its windows at the victim. The victim ignored him, however, remaining in the saw cab and continuing to work through the usual lunch break.

Later that afternoon, Virgil Knight met the defendant in the sawmill as the defendant was returning from a trip out to the victim's vehicle, which had aroused Virgil Knight's suspicions. The defendant told him the victim owed him $5000, and he advised the defendant to let "the law" handle the dispute. The defendant responded that the victim would just "buy the law off" and that he had been in jail before and did not care about trouble. As he walked off, the defendant also said that the victim was "going to regret it." Virgil Knight testified he was headed to warn the victim not to leave the saw cab when the defendant cut the power to the mill. Before Knight could reach the saw cab, the victim had run down the steps, straight into the defendant's gun. The witness described the scene:

> And when I looked up, [the victim] done run down the steps and he had the gun right in his face. Pow. (Demonstrating shooting) Straight in the face. Right in the jaw. And [the victim] run, run around the car. And he shot him right in the back. Because how come me to know it was his back, the blood popped out there as soon as that bullet hit.
>
> And [the victim] run around, here (indicating), and he [the defendant] run around the other side. Come around and shot four (4) more times. Before I knew where he shot him at, if it was in the head.
>
> Well, he come on back around and swinging his pistol. And I run around there where [the victim] was at. And [the victim] was dead. I mean, I picked his arm up and everything and he was plumb dead, then.

The witness testified the victim was at the bottom of the stairs leading to the saw cab, the defendant was ten to twelve feet from the victim, and he was approximately thirty feet from the defendant, when the defendant first shot the victim. On cross-examination, he acknowledged he initially told police that the defendant had shot the victim four times in the chest but explained that he had given the statement while in a state of emotional shock. He said he never heard the victim threaten to throw the defendant into the saw.

Johnny Henry, Sr., testified he was working for the victim at the sawmill the day of the shooting when the defendant approached him sometime between 1:00 and 2:00 p.m., asked for a cigarette, and said, "[I]f this son of a bitch ain't got my money," referring to the victim, "I'm going to blow his brains out." Thinking it was just angry talk, the witness told the defendant, "[W]ell, that's between y'all," and walked off. He was later working beside Albert Fuqua when he heard the power to the mill shut off. Looking up, he saw the defendant walk from the electrical boxes to a position where the victim could see him through the windows of the saw cab, and beckon for the victim to come down. The witness described what happened next:

> When, [the victim] wouldn't come downstairs, he - - There is a little walkway and there's a little grey box when you - - where you've got to come through at. And there's a yellow laser light. He picked - - [The victim] grabbed the laser light. He had a laser light in his hand.
>
> And he walked over there and this man, right here (indicating), was facing him. He had the gun out. He did, he - - when he motioned him down, he had his gun out. But when - - when [the victim] got on that little wooden platform, he had his gun ready. He was aiming his gun and everything.
>
> Well, [the victim] told him, he said, well, you son of a bitch, you better shoot me.
>
> As soon as [the victim] took one (1) step off that platform, he shot. Then I seen [the victim] drop the laser light and grab his face. Then he spun around and he ran back up to where that little grey box was and I heard another shot.
>
> And after that, I don't know. I couldn't tell you what happened, because I took off running.

The witness testified the victim still had one foot on the platform and was ten to fifteen feet from the defendant when the defendant fired his first shot, and was running away from the defendant when the defendant fired the second shot. He did not see the victim with anything besides the laser light in his hands. He testified the victim never struck or attempted to strike the defendant with the

-8-

laser light, and was still far enough from the defendant at the time the first shot was fired that the defendant "could have got out . . . of there before [the victim] got to him." On cross-examination, he acknowledged that there was no question but that the victim had grabbed the laser light to use as a weapon.

The State's final witness, Jessie Henry, who worked as a sawyer for the victim, testified he saw the defendant and the victim arguing at about 10:00 a.m. on the day of the shooting and heard the victim order the defendant to leave his property. The defendant left, but returned at about 1:00 or 1:30 p.m. and began pacing up and down. At about 2:00 or 2:30 p.m., the witness was in the saw cab with the victim when the electrical current shut off and the defendant walked in front of the cab and motioned for the victim to come down. Pushing the witness aside, the victim ran out of the cab, down the steps, and along the wooden platform to a gray electrical box, where he told the defendant, "[Y]ou better shoot me, now." The witness testified that the words were "no sooner . . . said" than the defendant shot the victim in the jaw. Next, the defendant "went all the way around in a circle with his gun," coming near the witness in a threatening manner, before the victim "kind of turned" and the defendant shot him again. The victim then grabbed his stomach and made his way around the wall to the other side, where he fell face down over some logs. After watching the victim fall, the witness turned back around and, not seeing the defendant anywhere, jumped from the saw cab and fled to his truck. On the way, he encountered Virgil Knight, told him he thought his brother was dead, and warned him not to go to that area of the sawmill. As he continued past Virgil Knight to his vehicle, he heard three more gunshots, which probably occurred within "seconds" after the first two were fired.

The witness stated that the victim never left the platform and he never saw him with anything in his hands. He acknowledged he told police in a statement he wrote approximately three hours after the shooting that the victim had picked up a wrench as he started outside, but he said he was mistaken, explaining: "Yes, sir, but I . . . that's what I thought, but [the victim] didn't have nothing [sic] in his hand. When he went off them [sic] steps, he had both hands on them [sic] rails, in a run."

The first two witnesses who testified on the defendant's behalf were his mother and father, Wanda and Larry Thomason. Wanda Thomason testified that the defendant asked his father the morning of the shooting to take him to get his car and they left the house together between 11:00 and 11:30 a.m. At about 1:30 p.m., the defendant called and told her the victim was not going to give him his money or his car and he needed his father to return to pick him up. With respect to his money, the defendant told her that he was going to have to "write it off as a loss"; he did not make any threats toward the victim. On cross-examination, Mrs. Thomason identified the murder weapon as her father-in-law's pistol, which had been kept in a chest of drawers for the past thirty years. She said she was not aware that the defendant knew its location, and she had not seen him with the gun when he left the house that morning.

Larry Thomason testified he took the defendant first to the shop, where they saw that the defendant's car was blocked, and then to the sawmill, arriving between 11:45 a.m. and 12:00 p.m. After letting the defendant out, he waited for about ten minutes until the defendant returned to the

truck and told him to go home, that he would get "him," without mentioning a name, to take him back to get his car. However, when he arrived home, his wife informed him that the defendant had called and wanted him to return to get him. Everyone was leaving the premises as he arrived back at the sawmill, and he parked, got out, and began walking down the hill toward the buildings. The defendant, pistol in hand, met him, told him the victim had threatened him with a wrench and he had shot him, and asked to be taken to the sheriff's office. When he refused, the defendant said, "[W]ell, we'll just wait" because it would not be long before "they will be here, anyhow."

Mr. Thomason testified he did not know the defendant had the pistol until he saw him with it after the shooting. He identified photographs of the weapons he had kept in his home, which, in addition to the murder weapon, included an assortment of shotguns, a .22 rifle with a scope, and a .32 Colt. He said he had ammunition for all the weapons, but they were kept unloaded in the house. Had the defendant given any indication that he intended to harm the victim, he would have never taken him to the sawmill. On cross-examination, he denied he would have been less likely to miss the .22 pistol, kept in the dresser drawer, than one of the weapons kept in his gun rack.

Timothy Wayne Adcock testified he was a sawyer and the current owner of the Poplar Ridge sawmill. He identified the ratchet found at the murder scene as a three-quarter-inch ratchet, the size required to made periodic adjustments to the saw's guide system in order to make the saw run true, and said that 90% of the time he was working he kept a similar ratchet within arm's length. Adcock testified he employed some of the same men who had worked for the victim, and he heard a different story every time he heard them relate the events that transpired on the day of the shooting. On cross-examination, Adcock testified that shutting off power to the sawmill while the saw was cutting risked not only ruining the $2600 to $3000 saw, but also the shaft, which cost a minimum of $1500, and required two-and-a-half days of labor to install. Adcock agreed that having the power shut off while sawing would create a "crisis situation."

Ernie Ellis, a resident of Springfield, Robertson County, testified that the victim had a reputation in the community for violence. Furthermore, based on his own personal business dealings with the victim, he believed him to be a violent person who would take matters in his own hands if he did not get his way. Another Springfield resident, Kermit Steven Barbee, also testified that the victim had a reputation in the community for violence and that his personal opinion was that the victim was a violent man. Barbee said he had performed landscaping work for the victim in the past, for which he had never been paid. He stated that when he first asked the victim for his money upon completion of the work, the victim told him to return for it in a week. However, when he approached the victim in his truck a week later, the victim told him they did not have a contract and he was not going to pay him. When he protested, the victim "chuckled a little bit" as he pulled out a twenty-five automatic, laid it on the dash of his truck, and repeated, "[Y]ou ain't getting paid." On cross-examination, Barbee acknowledged the events he had described had occurred in October 1987.

Investigator Travis Walker, recalled by the defense, testified he had spoken during the course of the investigation with Bill Watts, recently deceased, who had allowed the defendant to use his

telephone to call his father on the day of the shooting. Investigator Walker said that Watts reported that the defendant's demeanor was normal during that time.

Kelly Beatrice Adcock, Timothy Adcock's wife, testified she did not see any blood on or around the catwalk when she visited the sawmill at about the time of the victim's funeral. However, she did see some small blood droplets in the area previously described as the "open area" near the logs over which the victim had fallen, which she indicated by marking on a photograph. Mrs. Adcock also said that, during that same time, she found a large metal wrench in the "two shot" area of the sawmill. On cross-examination, she acknowledged that Gary Toothman and several other employees were in the area before she arrived. She further acknowledged that she used bleach to clean the blood at the murder scene during the week of October 21.

The final witness for the defense was Assistant Public Defender Richard D. Taylor, Jr., who testified he had taken measurements at the sawmill and found that it was fifty-seven-and-one-half inches from the bottom of the catwalk to the ground, and seventy-eight inches from the bottom of the rails to the ground, at the edge of the previously marked "open area."

## ANALYSIS

### I. Special Jury Instruction

As his first issue, the defendant contends that the trial court erred in its instructions on self-defense, which included the following:

> There is no duty to retreat before a person uses force. The use
> of force against another is not justified if the defendant provoked the
> deceased['s] use or attempted use of unlawful force[] [u]nless the
> defendant abandoned the encounter or clearly communicated to the
> deceased the intent to do so and the deceased never the less [sic]
> attempted to use unlawful force against the defendant.

Defense counsel unsuccessfully sought to have the following statement on provocation inserted at the conclusion of the above paragraph:

> This does not mean that if the victim was provoked to use or
> attempt to use unlawful force, but whether a [sic] average reasonable
> person would have been provoked to use such unlawful force. You
> may find that the victim was provoked to use unlawful force, but that
> a [sic] average reasonable person would not have been so provoked,
> in which case the defendant's use of force could be justified.

The defendant argues on appeal that the trial court's instructions failed to adequately explain that Tennessee Code Annotated section 39-11-611, the statute on self-defense, codifies the common

-11-

law concept of "the initial aggressor." He cites the sentencing commission comments to the self-defense statute, which state in pertinent part:

> Subsections (c), (d) and (e) are restrictions to the defense. Subsections (c) and (d) continue the traditional rule that the defendant claiming justification should be free from fault in bringing on the necessity of using force. . . .

> Subsection (d) also restricts the defense by codifying the traditional concept of the initial aggressor. In order to use the defense, the initial aggressor must withdraw or communicate an intent to withdraw and the force must continue despite this communication. See Irvine v. State, 104 Tenn. 132, 56 S.W. 845 (1900); Gann v. State, 214 Tenn. 711, 383 S.W.2d 32 (1964).

Tenn. Code Ann. § 39-11-611, Sentencing Comm'n Comments.

In Gann, our supreme court explained:

> The law of Tennessee is that an aggressor, who produces fear or apprehension of death or great bodily harm in the mind of his adversary, can not lawfully defend his life against the deadly defensive act of his adversary by taking the latter's life, until he has restored his right of self-defense, lost by his initial fault, by abandoning and withdrawing from the contest and giving notice of the fact to the adversary.

383 S.W.2d at 36.

Characterizing his action in cutting the power to the sawmill as "slight provocation" intended solely to get the victim to engage in conversation with him, and ignoring the fact that he followed that action by holding a gun on the victim as he beckoned him from the saw cab, the defendant argues that had the jury received the special instruction he requested, it could have found that he "was not the initial aggressor and thus did not lose his claim for self-defense." The State responds by noting that the trial court issued the pattern jury instruction on self-defense and referred the jury to the definition of adequate provocation previously given in connection with the instructions on voluntary manslaughter. The State further notes that defense counsel acknowledged at trial that the special jury instruction might be "redundant." The State, therefore, argues that the trial court's instructions contained a fair and accurate statement of the law, and that it did not err in refusing the special instruction.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a

-12-

complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

The record reflects that the trial court's full instructions on self-defense tracked, almost word for word, the language of the pattern jury instruction. See Tenn. Code Ann. § 39-11-611 (1997); T.P.I. –Crim. 40.06 (6th ed. 2001). We, therefore, agree with the State that the instructions contained a fair and accurate statement of the law and that the trial court did not err in refusing to give the special instruction requested by the defendant.

## II.  Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence in support of his first degree premeditated murder conviction. When the sufficiency of the convicting evidence is challenged, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997 & 2003). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d) (1997 & 2003).

In Tennessee, once a homicide is established it is presumed to be second degree murder and the State bears the burden of proving the element of premeditation to elevate the offense to first degree murder. See State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Whether premeditation exists is a question for the jury to determine based on the evidence, and it may be established by the defendant's conduct and the circumstances surrounding the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our courts have listed a number of different facts from which premeditation may be inferred, including evidence the defendant had a motive for the killing; evidence that the defendant procured a weapon; the defendant's declarations of an intent to kill; evidence the defendant made preparations to conceal the crime before the killing; the defendant's use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; evidence that the victim was retreating or attempting to flee; infliction of multiple wounds; evidence of the defendant's calmness immediately following the killing; and the defendant's destruction or secretion of evidence after the killing. See State v. Dellinger, 79 S.W.3d 458, 492 (Tenn. 2002), cert. denied, 537 U.S. 1090, 123 S. Ct. 695, 154 L. Ed. 2d 635 (2002); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The defendant contends that the State failed to prove premeditation beyond a reasonable doubt and that the evidence at most supports a conviction for second degree murder. In support, he cites, *inter alia*, the evidence that the victim approached him in a threatening manner while armed with a laser light and a ratchet; the fact that he shot the victim in the presence of witnesses, made no preparations beforehand for concealment of the crime, and made no attempts to flee or secrete any evidence after the killing; and his statement to police, in which he claimed that his sole intention in returning to the sawmill was to get the victim to talk to him about his money and that he shot the victim in self-defense after he twice came at him in a menacing manner. The State argues that the evidence of premeditation was overwhelming, and we agree.

When viewed in the light most favorable to the State, there was ample evidence to show beyond a reasonable doubt that the defendant committed an intentional and premeditated killing of the victim. The defendant had a clear motive for the crime; took steps to retrieve the murder weapon from the dresser drawer in which it was stored, load it with ammunition, and carry it to the sawmill without his parents' knowledge; made a direct declaration of his intent to kill the victim to Johnny Henry; paced up and down beside the saw cab in an unsuccessful attempt to get the victim to emerge; warned the victim's brother that the victim was going to "regret it"; deliberately cut the power to the sawmill, the one action he must have known would enrage the victim enough to draw him at last from the relative safety of the saw cab; beckoned the victim down with his pistol in hand; shot the victim in the jaw when the victim, realizing he was serious, was turning to flee; shot the victim in the back as he was running away; and, finally, followed the victim to the other side of the wall, where he fired three more shots that struck the victim's body, including the close-range, fatal shot to the victim's head. The defendant's calmness before and after the shooting is additional evidence in support of the jury's finding that the act was premeditated.

The defendant relies on his statement to police to assert that the evidence shows he first shot the victim "in fear of his life and in a last minute decision," as the victim advanced on him while armed with a laser light and a ratchet, and fired the fatal shot only when he "found [the victim] charging at him again" as he rounded the corner of the wall on his way out of the sawmill. In support of this version of events, defense counsel spent a great deal of time at trial attempting to show the alternate, easier routes the victim could have taken to escape and/or reach the side of the wall where his body was found. All the eyewitnesses to the shooting, however, characterized the victim as attempting to flee from the defendant after the initial shot was fired. Furthermore, Johnny Henry, the only witness to unequivocally testify that the victim was initially armed, corroborated other eyewitnesses' accounts that the victim was at least ten feet from the defendant when the defendant first fired his gun. In sum, there was ample evidence from which the jury could have inferred that the defendant premeditated the victim's killing. Therefore, after viewing the evidence in the light most favorable to the State, we conclude that it was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of first degree premeditated murder.

### III. Prosecutor's Alleged Improper Comment During Closing Arguments

As his final issue, the defendant contends that the prosecutor made an improper comment during closing arguments, unfairly prejudicing the outcome and entitling the defendant to a new trial. Specifically, he argues that the prosecutor's statement, "And if you choose the lessor [sic] offense of criminally negligent homicide, you might as well give the defendant a badge and a gun and make him the County Debt Collector," amounted to telling the jury that . . . "an acquittal on first degree murder would be tantamount to no punishment." The State argues, alternately, that the issue is waived, the prosecutor's remarks were innocuous, and the comment could not have resulted in any prejudice since the jury convicted the defendant of first degree murder, an offense several rungs above the lesser offense to which the prosecutor referred in the statement.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

As noted by the State, the only portion of the closing arguments included on appeal is the single sentence, quoted above, of which the defendant now complains. Thus, there is no evidence as to whether the comment occurred during the prosecutor's initial closing argument or on rebuttal, whether defense counsel objected to the comment at trial; or whether the trial court issued any curative instructions to the jury. It is the defendant's duty to provide a full and complete record to this court of the issues he raises on appeal. See Tenn. R. App. P. 24(b). The defendant's failure to provide the complete record, combined with his suggestion that this court review the issue as plain error, leads us to presume that he failed to make a contemporaneous objection at trial. In such a case, the issue is waived. See Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives later complaint).

Even if not waived, the issue is without merit. Again, in the absence of a complete record, it is simply impossible for us to determine the context in which the statement was made,[1] the prosecutor's intent, or whether the statement was followed by any curative actions on the part of the prosecutor or the trial court. What is clear, however, is that the statement occurred in a case in which the State presented strong evidence of the defendant's guilt. We, conclude, therefore, that the

---

[1]For example, there is no way for us to determine if the statement occurred during rebuttal, in response to a comment by defense counsel in closing.

defendant is not entitled to a new trial on the basis of any alleged improper comment made by the prosecutor in closing argument.

## **<u>CONCLUSION</u>**

Based on the foregoing authorities and reasoning, we affirm the judgement of the trial court.

_____
ALAN E. GLENN, JUDGE